IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CR 25-26-M-DWM-1 |
| Plaintiff, | |
| vs. | ORDER |
| ZABI ULLAH MOHAMMED, | |
| Defendant. | |

On October 29, 2025, following a three-day jury trial, Defendant Zabi Ullah Mohammed was found guilty of conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349 (Count 1), and wire fraud in violation of 18 U.S.C. §§ 1343, 1349 and 2 (Count 2), as charged in the Superseding Indictment. (Doc. 92.) The Presentence Investigation Report ("PSR") calculated Mohammed's Guideline range to be 78–97 months based on a total offense level of 28 and a criminal history category of I. (PSR ¶ 119.) That total offense level of 28 includes a base offense level of 7 (PSR ¶ 61), an 18-level increase for a total loss amount of $3,904,653.00, (PSR ¶ 62), a 4-level increase for substantial financial hardship to five or more victims, (PSR ¶ 63), a 2-level increase for a substantial part of the scheme having been committed outside the United States, (PSR ¶ 64), no victim-related adjustment, (PSR ¶ 65), and a 3-level mitigating role reduction (PSR ¶ 66).

1

Both parties objected to the calculation of the total offense level.  The government objected that a 2-level vulnerable victim increase, USSG §3A1.1(b)(1), should have been applied, and that a 3-level mitigating role reduction, USSG §3B1.2(c), should not have been applied.  Mohammed objected to the 18-level increase for a loss amount of $3,904,653, USSG §2B1.1(b)(1)(J), that a 2-level increase for a substantial part of a fraudulent scheme having been committed outside the United States, USSG §2B1.1(b)(10)(B), should not have been applied, and that a 2-level zero-point offender reduction, USSG §4C1.1, should have been applied.

Mohammed's sentencing hearing was held on February 26, 2026.  The parties were heard on their objections.  The government called one witness, FBI Special Agent Schrader.  Based on the briefing provided by the parties and their arguments at sentencing, the Court made the following determinations at the hearing, which are explained below.

- A 2-level vulnerable victim increase, USSG §3A1.1(b)(1), is applied;
- A 3-level mitigating role reduction, USSG §3B1.2(c), is applied;
- A 16-level increase based on a loss amount of $1,941,933, USSG §2B1.1(b)(1)(J), is applied;
- A 2-level increase for a substantial part of a fraudulent scheme having been committed outside the United States, USSG §2B1.1(b)(10)(B), is applied; and
- The zero-point offender reduction, USSG §4C1.1, is not applied.

## ANALYSIS

The government bears the burden of proof when seeking to raise the offense level and the defendant bears the burden of proof when seeking to lower the offense level. *United States v. Felix*, 561 F.3d 1036, 1043 (9th Cir. 2009). Generally, the burden of proof for enhancements and reductions is a preponderance of the evidence. *See United States v. Mejia-Luna*, 562 F.3d 1215, 1221 (9th Cir. 2009).

### I.    Government Objection 1 (Vulnerable Victim Adjustment)

The PSR did not apply the vulnerable victim adjustment, USSG §3A1.1(b)(1), to the total offense level calculation. (PSR ¶ 65.) The government objected that this adjustment was not applied. (PSR Add. at 1; Doc. 110 at 3–6.) The vulnerable victim adjustment states that "[i]f the defendant knew or should have known that a victim of the offense was a vulnerable victim, increase by 2 levels." USSG §3A1.1(b)(1) (alteration omitted).

The government argued that Mohammed's victims "are vulnerable due to their age" given the susceptibility of the elderly to telemarketing fraud. (Doc. 110 at 3–6). The government insisted "Mohammed knew or should have known that the victims in this case were elderly because he personally picked up their cash and gold and could observe their physical appearance" and text messages Mohammed received and sent identified the ages of his victims. (Doc. 110 at 4–5.)

3

Mohammed responded to this objection at the sentencing hearing. Because he played no role in selecting the victims and had no control over who was selected, Mohammed argued that this increase did not apply. Ultimately, the government is correct.

The Guidelines define "vulnerable victim" as "a person . . . who is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct." USSG §3A1.1 app. n.2. Mohammed's victims who were aged 63–84 at the time of trial, (Ex. 5 at 5; Ex. 504 at 1; Carabin (78); Soukonnikov (72); Shumans (63); Coretti (72); Reiss (84)) can be considered elderly within the meaning of this adjustment, *see Scrivener*, 189 F.3d at 951 (finding victims to be elderly within the meaning of the "vulnerable victim enhancement" where "of the thirty-six identifiable victims in this case, only two were under sixty years of age, and more than fifty percent were at least eighty years old"). "[I]t is beyond dispute that elderly victims are susceptible to telemarketing fraud." *Scrivener*, 189 F.3d at 950–51; *see also* United States Dep't of Justice, *Annual Report to Congress on Department of Justice Activities to Combat Elder Fraud and Abuse* (Nov. 2025).

Accordingly, Mohammed's victims are "vulnerable victims" within the meaning of the vulnerable victim adjustment.

"The vulnerable victim enhancement . . . applies whenever the offense of

4

conviction involved relevant conduct that victimized a person that the defendant knew or should have known was vulnerable." *United States v. Johnson*, 297 F.3d 845, 873 (9th Cir. 2002) (internal quotation marks omitted). Application does not require that the defendant "target[ed] or single[d] out vulnerable victims." *United States v. O'Brien*, 50 F.3d 751, 755–56 (9th Cir. 1995). "Actual or constructive knowledge of a victim's vulnerability suffices for the enhancement under [USSG] §3A1.1 to apply." *United States v. Scrivener*, 189 F.3d 944, 950–51 (9th Cir. 1999). This enhancement

> [A]pplies to offenses involving an unusually vulnerable victim in which the defendant knows or should have known of the victim's unusual vulnerability. The adjustment would apply, for example, in a fraud case in which the defendant marketed an ineffective cancer cure or in a robbery in which the defendant selected a handicapped victim. But it would not apply in a case in which the defendant sold fraudulent securities by mail to the general public and one of the victims happened to be senile.

USSG §3A1.1 app. n.2.

Here, Mohammed's crimes of conspiracy to commit wire fraud and wire fraud victimized elderly persons who are "vulnerable victims" as explained above. The fraud scheme here is not one in which all victims "happened to be" elderly. *See* USSG §3A1.1 app. n.2. The elderly were exploited because of their vulnerabilities. Although Mohammed did not target or single out his victims, application of this enhancement does not require that. *See O'Brien*, 50 F.3d at 755–56. During the course of his involvement with the scheme, Mohammed

5

travelled throughout the United States to New York, Virginia, New Hampshire, Delaware, North Carolina, Maryland, Colorado, Massachusetts, Ohio, Pennsylvania, Rhode Island, and Montana. (Ex. 50.) In each of these places he picked up cash or gold from his elderly victims. At the time of pickup, his victims were instructed to walk away from their homes, (*e.g.,* Soukonnikov), allowing Mohammed to observe their physical appearance, he also received or sent text messages that identified the victims' ages (*e.g.*, Ex. 5 at 5 (age 78); Ex. 31 at 16 (aged 78), 25 (age 81)), and received a picture of at least one victim, (Ex. 5 at 5). Thus, Mohammed either knew or should have known his victims were vulnerable. *See Scrivener*, 189 F.3d at 951 (explaining "a reasonable person would have concluded by the sound of their voices over the telephone that the solicited victims were elderly").

Accordingly, the 2-level vulnerable victim enhancement is applied.

## II. Government Objection 2 (Mitigating Role Adjustment)

The PSR applied the 3-level mitigating role reduction, USSG §3B1.2, in the total offense level calculation. (PSR ¶ 66.) The government objected to this reduction. (PSR Add. at 2; Doc. 110 at 6–8.)

The mitigating role adjustment states that:

Based on the defendant's role in the offense, decrease the offense level as follows:
> (a) If the defendant was a minimal participant in any criminal activity, decrease by **4** levels.

6

> (b) If the defendant was a minor participant in any criminal activity, decrease by **2** levels.
>
> In cases falling between (a) and (b), decrease by **3** levels.

USSG §3B1.2. The United States Probation Officer applied the 3-level mitigating role reduction because Mohammed's role "falls between being considered a minimal[] and minor participant." (PSR ¶ 66.)

The government argued that Mohammed's "role was more similar to a street-level drug dealer than a blind mule" and that the "scheme does not work without" him. (Doc. 110 at 7.) The government also highlighted that Mohammed's brother-in-law Mohammed Faizuddin Siddiqui, who Mohammed recruited, "is the type of participant who might warrant a minor or minimal role reduction," because he did not direct others in the scam" and "retrieved" only "$241,000 in cash and gold." (*Id.*)

On the other hand, Mohammed argued he should receive the minimal participant reduction because he was "disconnected . . . from the deception of this scheme" as is demonstrated by the fact that he arrived to pick up gold and cash from his victims "without identifying himself as law enforcement" and "often dressed in regular clothes." (Doc. 111 at 9.) Mohammed insisted that the jury verdict acquitting him of the charge of impersonating a federal agent "is a signal that Mohammed is less culpable for this conspiracy than the main perpetrators." (Doc. 111 at 9.)

7

"[W]hether to apply subsection (a) or subsection (b), or an intermediate adjustment, is based on the totality of the circumstances and involves" a "fact-based" inquiry through consideration of the following factors:

> (i) the degree to which the defendant understood the scope and structure of the criminal activity;
> (ii) the degree to which the defendant participated in planning or organizing the criminal activity;
> (iii) the degree to which the defendant exercised decision-making authority or influenced the exercise of decision-making authority;
> (iv) the nature and extent of the defendant's participation in the commission of the criminal activity, including the acts the defendant performed and the responsibility and discretion the defendant had in performing those acts;
> (v) the degree to which the defendant stood to benefit from the criminal activity.

USSG §3B1.2 app. n.3(C).

The evidence at trial shows that application of the intermediate mitigating role adjustment is warranted. Mohammed understood, at least to a degree, the scope and structure of the criminal activity. *See* USSG §3B1.2 app. n.3(C)(i). For example, in text messages, he described the fraudulent scheme as a "big ass cartel chain," (Ex. 30 at 15), comprised of "illegal shit," (Ex. 29 at 10). Mohammed was involved in planning, organization, and had decision-making authority, *see* USSG §3B1.2 app. n.3(C)(ii), (iii), when he recruited his brother-in-law Siddiqui into the scheme and directed him regarding pickups and transfers, (Ex. 31). As to the nature and extent of his participation in the commission of the criminal activity, USSG §3B1.2 app. n.3(C)(iv), Mohammed did not have much discretion as he

8

repeatedly had to check in with his handler and send videos of himself counting money. (*E.g.*, Ex. 5.) He can also be distinguished from other scheme participants who insisted to victims that they were United States government officials. (Exs. 1–4; Soukonnikov.) Lastly, the degree to which Mohammed stood to benefit from the criminal activity, USSG §3B1.2 app. n.3(C)(v), is high, as he stated in text messages that he made "32k for 7 d[a]ys" of work, (Ex. 30 at 35).

Together, these factors weigh in favor of application of the mitigating role adjustment as applied in the PSR: Mohammed falls between a minimal and minor participant. Accordingly, the 3-level mitigating role reduction is applied.

### III.  Mohammed Objection 1 (Loss Amount)

The PSR applied an 18-level loss amount increase, USSG §2B1.1(b)(1)(J), in the total offense level calculation. (PSR ¶ 62). Mohammed objected to the loss amount calculation of $3,904,653. (PSR Add. at 3.)

The Guidelines define "actual loss amount"[1] as "the reasonably foreseeable pecuniary harm that resulted from the offense" and reasonably foreseeable pecuniary harm is defined as "harm that the defendant knew or, under the circumstances, should have known, was a potential result of the offense." USSG §2B1.1(b)(1)(C). "[I]n the case of a jointly undertaken criminal activity,"

---

[1] "Loss is the greater of actual loss or intended loss." USSG §2B1.1(b)(1)(C). Actual loss is at issue here.

9

defendants are accountable for "all acts and omissions of others that were . . . (i) within the scope of the jointly undertaken criminal activity, (ii) in furtherance of that criminal activity, and (iii) reasonably foreseeable in connection with that criminal activity." USSG §1B1.3(a)(1)(B).

Mohammed argued that he "should only be held accountable for the losses directly attributable to his activities, which totals [$]1,700,900," (Doc. 111 at 2), which would result in a 16-level, rather than an 18-level, increase. He further asserted that the loss amount should be reduced by $420,000 because the government cannot prove by a preponderance of the evidence that the $420,000 in gold was ever picked up by Mohammed.

### a. Loss of $1,700,900

Mohammed argued that because he worked independently of other couriers and did not share information with them, "[h]e should not be saddled with loss amounts that other courtiers picked up." (Doc. 111 at 5.) He insisted the loss amount appropriately attributable to him is $1,700,900.

In response, the government argued that because Mohammed "knew that others were involved in the same criminal activity, and it was reasonably foreseeable that other couriers in the conspiracy would pick up additional money from the same victims that he defrauded[,] . . . [t]he loss amount [as calculated in the PSR] is appropriate." (Doc. 112 at 9.) In another section of its sentencing

memorandum, the government did acknowledge that "Mohammed personally picked up approximately $1,700,933 in gold and U.S. currency." (*Id.* at 3; *see also id.* at 11 ("Mohammed personally took over $1,700,000 from" his victims.).) Mohammed's argument is more persuasive.

"[A] district court may not automatically hold an individual defendant responsible for losses attributable to the entire conspiracy, but rather must identify the loss that fell within the scope of the defendant's agreement with his co-conspirators and was reasonably foreseeable to the defendant." *Lloyd*, 807 F.3d at 1142. "Knowledge of another participant's criminal acts is not enough to hold the defendant responsible for those acts, and knowledge of a conspiracy's overall objectives does not make the defendant accountable for all the coconspirators' acts furthering those objectives." *Id.* at 1142–43 (internal citations and quotation marks omitted). To determine scope and reasonable foreseeability, courts can look at whether co-conspirators "worked together, relied on one another . . . , attended the same . . . meetings, . . . pool[ed] resources . . . or share[d] information." *Id.*

An illustration of two defendant drug dealers provided in the Guidelines is also helpful here. §1B1.3 app. n.4(C)(vi). "Defendant P and . . . other [local] dealers share a common source of supply, but otherwise operate independently . . . . In contrast, Defendant Q, another street-level drug dealer, pools his resources and profits with four other street-level drug dealers." *Id.* The former is not engaged in

11

a jointly undertaken criminal activity while the latter is. *Id.*

The record does not show that Mohammed worked with, relied on, conferred with, or shared information or resources, with other couriers involved in the fraudulent scheme. Knowledge that other coconspirator couriers existed or that the scheme included such couriers is not enough to establish the requisite scope and foreseeability here. *See Lloyd*, 807 F.3d at 1142–43. However, because Mohammed recruited his brother-in-law Siddiqui into the scheme and directed him regarding pickups and transfers, (Ex. 31), Mohammed is held responsible for the $241,000 that Siddiqui retrieved. Such a loss amount was reasonably foreseeable to Mohammed and fell within the scope of his agreement with Siddiqui. *See* USSG §2B1.1(b)(1)(C), §1B1.3(a)(1)(B).

Accordingly, the total loss amount is $1,941,933, which reflects the total amount of cash and gold Mohammed picked up, (Ex. 50 ($1,700,933)), plus the total amount that Siddiqui picked up, (Ex. 31 ($241,000)). Accordingly, a 16-level increase to the total offense level, USSG §2B1.1(b)(1)(I), is applied.

### b. $420,000 in Gold

Mohammed argued that the loss amount should also be reduced by $420,000 in gold. He insisted that the only evidence of this gold is three pictures on his phone from which it cannot be ascertained who the victim was, if Mohammed took the pictures, or if he picked up the gold. (Doc. 111 at 6.) This would result in an

12

additional 2-level reduction. At sentencing, Agent Schrader testified that this amount in gold was picked up by Mohammed and part of the conspiracy based on its consistency with other photos and text messages on Mohammed's phone and because it fits within the time frame of his other pickups. Ultimately, the government has carried its burden by a preponderance of the evidence.

The evidence of the $420,000 in gold is the pictures referred to by Mohammed, (Ex. 53), as well as a video, (Ex. 52). This video dated December 7, 2024 shows a package being opened that contains gold bars, and the counting of these gold bars. (Ex. 52.) These pictures and this video were taken from Mohammed's phone. (Agent Schrader.) From the box, gold bars, and carpet, it appears the package of gold bars is the same in the pictures and video. (*See* Exs. 52, 53.) The record also shows that the scheme included victims liquidating their assets into gold bars after being instructed to do so by co-conspirators. (Soukonnikov; *e.g.*, Exs. 54, 55, 70.) There are other videos in evidence of Mohammed counting cash and gold as a means of ensuring his handlers that he was not taking any of the cash or gold. (*E.g.*, Ex. 60; *see also* Mohammed; Agent Schrader.) Mohammed's handlers expressly told him not to film his face in such videos. (Ex. 37; Agent Schrader.) In Exhibit 54, which is a video showing Mohammed opening a package of gold bars in a car, Mohammed is wearing a ring, which also appears to be visible in Exhibit 52. (*Compare* Ex. 54 *with* Ex. 52.)

This pickup also fits within the time frame of Mohammed's other pickups of cash and gold. (Ex. 50.) Although, the location of the pickup for the $420,000 in gold is unknown, (Exs. 50, 95), the record shows that, by a preponderance of the evidence, this gold can be attributed to Mohammed.

Mohammed's objection that the loss amount should be reduced by the $420,000 in gold is overruled. The total loss amount, as explained above, should be $1,941,933, which results in a 16-level increase, §2B1.1(b)(1)(I).

## IV. Mohammed Objection 2 (Outside United States Increase)

The PSR applied a 2-level increase in Mohammed's offense level calculation because a substantial part of the fraudulent scheme was committed outside the United States, USSG §2B1.1(b)(10)(B). (PSR ¶ 64.) Mohammed objected to this 2-level increase under USSG §2B1.1(b)(10)(B), which provides that "[i]f . . . a substantial part of a fraudulent scheme was committed from outside the United States . . . increase by 2 levels." Mohammed argued that the government "has not actually provided any evidence linking this case to India." (Doc. 111 at 6.) The government argued that there is sufficient evidence for this increase because "Mohammed admitted during his pretrial debrief with law enforcement that his primary contact [for] the scam lives in India," "he sent money transfers to India," and "[h]e referenced 'the Center' which is the head of the criminal organization based in India." (Doc. 110 at 10–11).

Because the Sentencing Guidelines do not define "substantial," dictionary definitions may be consulted in determination of the plain meaning of this term. *United States v. Flores,* 729 F.3d 910, 914 (9th Cir. 2013). "Substantial" means "[i]mportant, essential, and material." *Substantial*, Black's Law Dictionary (12th ed. 2024).

Mohammed's handler, Rocky or Faizul, who Mohammed took direction from and regularly corresponded with, lived in India. (Ex. 34; Mohammed) At trial, Mohammed testified that when he first became involved in the fraudulent scheme, he was added to a USA-India Business Group. (Mohammed.) He also testified that he sent money to India and was directed by the Center, which is an Indian-based criminal organization. (Mohammed.) At sentencing, Agent Schrader testified that Mohammed also made four payments to India. (Agent Schrader.) The record therefore shows that coordination of and instruction as to the fraudulent scheme came from outside the United States. This part of the scheme was important, essential, and material.

Accordingly, the 2-level increase is applied.

## V. Mohammed Objection 3 (Zero-Point Offender Reduction)

Mohammed objected that he did not receive the 2-level reduction to his total offense level as a zero-point offender under USSG §4C1.1. He argued that "he did not personally cause the loss at issue." (Doc. 111 at 8.) The government argued

15

the opposite: Mohammed "personally took over $1,700,000 from the victims in this case." (Doc. 110 at 11.)

The zero-point offender adjustment applies if the defendant meets all of the following criteria:

> (1) the defendant did not receive any criminal history points from Chapter Four, Part A;
> (2) the defendant did not receive an adjustment under §3A1.4 (Terrorism);
> (3) the defendant did not use violence or credible threats of violence in connection with the offense;
> (4) the offense did not result in death or serious bodily injury;
> (5) the instant offense of conviction is not a sex offense;
> (6) the defendant did not personally cause substantial financial hardship;
> (7) the defendant did not possess, receive, purchase, transport, transfer, sell, or otherwise dispose of a firearm or other dangerous weapon (or induce another participant to do so) in connection with the offense;
> (8) the instant offense of conviction is not covered by §2H1.1 (Offenses Involving Individual Rights);
> (9) the defendant did not receive an adjustment under §3A1.1 (Hate Crime Motivation or Vulnerable Victim) or §3A1.5 (Serious Human Rights Offense);
> (10) the defendant did not receive an adjustment under §3B1.1 (Aggravating Role); and
> (11) the defendant was not engaged in a continuing criminal enterprise, as defined in 21 U.S.C. § 848

USSG §4C1.1(a).

Because the vulnerable victim enhancement is applied, Mohammed is ineligible for the zero-point offender reduction. USSG §4C1.1(a)(9).

16

CONCLUSION

Based on the foregoing, IT IS ORDERED that the government's first objection is SUSTAINED, and its second objection is OVERRULED. Mohammed's first objection is SUSTAINED in part and OVERRULED in part, his second objection is OVERRULED, and his third objection is OVERRULED. The 2-level vulnerable victim increase, USSG §3A1.1(b)(1), is applied; the 3-level mitigating role reduction, USSG §3B1.2, is applied; a 16-level increase for a loss amount of $1,941,933, USSG §2B1.1(b)(1)(I), is applied; a 2-level increase for a substantial part of a fraudulent scheme having been committed outside the United States, USSG §2B1.1(b)(10)(B), is applied; and the zero-point offender reduction, USSG §4C1.1, is not applied.

Consistently, the Court adopted the PSR with changes to paragraphs 42, 62, and 65. These changes result in the same total offense level of 28, as originally calculated, meaning Mohammed's Guideline range does not change.

DATED this 26 day of February, 2026.

16:08 p.m.

Donald W. Molloy, District Judge
United States District Court

17